John E. Zehnder, Jr., WSBA No. 29440
   jzehnder@scheerlaw.com
Anthony David Gipe, WSBA No. 30491
   agipe@scheerlaw.com
Scheer & Zehnder LLP
720 Olive Way, Suite 1605
Seattle, WA 98101
206.262.1200
Attorneys for Defendants Matthew
Thuring and John Van Santford

UNITED STATE DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KENNETH CHARLES LASSITER and ALPHA DORIS D. LASSITER,

    Plaintiff,

v.

CITY OF BREMERTON, MATTHEW THURING, JOHN VANSANTFORD, RONALD FORBES, BREMERTON POLICE CHIEF, and DOES 1-10,

    Defendants.

NO. C05-5320RBL

DECLARATION OF MATTHEW THURING (EXHIBIT 1) IN SUPPORT OF RESPONSE BRIEF ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Matthew Thuring, make this declaration in support of my response to plaintiffs' motion for summary judgment, based on my own personal knowledge of the facts contained herein and under penalty of perjury and the laws of the State of Washington:

### General Information

1. I have been a police officer for over thirteen years. At all times relevant to the facts of this case I had eleven years of experience, primarily with the police department for the City of Bremerton.

DECLARATION OF MATTHEW THURING IN SUPPORT OF
RESPONSE BRIEF ON PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT – Page 1– U.S.D.C. Cause No. C05-5320RBL
21 005 cd174801

SCHEER & ZEHNDER LLP
720 OLIVE WAY, SUITE 1605
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

Exhibit 1, P. 1 of 10

2. In the course of my law enforcement career I have worked as a patrolman – during all shifts (days, swing shift, nights), and as an undercover detective. At the time of the events in this case, I was a patrolman on the day shift.

3. In qualifying to become a policeman, I trained at the Washington State Police Academy. As part of the curriculum at the academy, all officers are given domestic violence training. This training includes domestic violence statistics, response and operating procedures for answering domestic violence calls, psychology of the victim, victim safety procedures, securing a scene, and investigating domestic violence allegations.

4. In addition to academy training, I have attended 3-4 refresher courses on domestic violence given by the Department. Each training refresher was between four and eight hours in length and was taught by either a special assault officer and/or a county prosecutor. These sessions were designed to train officers in any changes to the law and operating procedures, as well as refreshing the known training already received.

5. I am also familiar with department operating procedures for response to domestic violence calls and I review them regularly and as needed. I also carry a laminated card detailing the procedures required in response to domestic violence.

6. In my career, when not on undercover assignment, I have handled an average of 7-10 domestic violence response calls per week for the last 13 years. In my experience, it is common to have weapons involved, and in entering a scene of domestic violence it is standard operating procedure to assume weapons are involved until the scene can be secured for investigation.

7. Our training in domestic violence response instructs us that officers are required by law to respond to all allegations of domestic violence. Our number one priority is to see to the safety of all parties involved, including our own safety. After we secure

DECLARATION OF MATTHEW THURING IN SUPPORT OF
RESPONSE BRIEF ON PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT – Page 2– U.S.D.C. Cause No. C05-5320RBL
21 005 cd174801

SCHEER & ZEHNDER LLP
720 OLIVE WAY, SUITE 1605
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

Exhibit 1, P. 2 of 10

1 safety, we must secure the scene so that we may question the parties involved as to
the alleged assault. Once the safety of the parties and the scene is secured, then we
investigate the facts. The Domestic Violence Protection Act requires officers to
appear and arrest offenders if – upon response to a complaint – officers can confirm
the occurrence of domestic violence.

8. In my experience and training, it is quite common for the victim of violence to deny the assault took place or to try to protect the alleged abuser. Reasons for this behavior range from fear of retaliation from the abuser to worries about the victim's finances if the abuser is incarcerated.

9. It also is common, in my experience and training, for the abuser to use various methods of intimidation to coerce the victim into telling us that nothing happened. These can be physical cues, verbal keywords, posture, tone, etc., even keeping the victim in line of sight the whole time to glare at the victim. Because of this it is standard procedure to separate the alleged victim from the alleged abuser to allow the victim a chance to speak without coercion.

### The Facts in the Present Case

10. On 25 July 2003 I responded to a "911" call regarding domestic violence allegations at the home of the Lassiters, located at 1305 Nipsic in Bremerton, Washington. I was the back up officer to the primary officer called. The primary officer was John Van Santford. Attached hereto is my supplemental report of the incidents occurring in response to that "911" report.

11. As I recall, the "911" report from dispatch indicated a possible domestic violence situation with a woman and a man. The woman was crying and the man was yelling. The "911" report also indicated that there were threats of harm by the

DECLARATION OF MATTHEW THURING IN SUPPORT OF
RESPONSE BRIEF ON PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT – Page 3– U.S.D.C. Cause No. C05-5320RBL
21 005 cd174801

SCHEER & ZEHNDER LLP
720 OLIVE WAY, SUITE 1605
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

Exhibit 1, P. 3 of 10

       man against the woman and the possibility of a knife being involved with a comment of "I'll cut your throat."

12. Officer Van Santford and I arrived at scene at approximately the same time, each in our patrol cars. It was around 1318 hours. We left our cars and proceeded to approach the house.

13. It is standard procedure in responding to a domestic violence call to make a quick visual inspection of the home or the area so that the officers can more easily see to their own safety and the safety of the parties involved. Officer Van Santford and I approached the house and each walked along opposite sides to determine if this was the right location and to assess any threats. I walked toward the Northeast corner of the house.

14. At this Northeast corner, I could hear a man yelling inside the house. He sounded loud and angry, but I could not clearly make out what he was saying.

15. I returned to the front of the house and met Officer Van Santford there. He indicated to me that he also heard yelling from a man inside. We approached the front door of the Lassiter home, and as we were walking to the door, we both clearly heard a man yell at someone to keep away from the windows and not to say anything. Then all the yelling and noise in the house stopped.

16. Officer VanSantford knocked on the door very loudly three or four times over the course of a minute or two. At one point he also yelled out "Police! Come to the Door!," but no one called out from inside or acknowledged the knocking until an Asian woman (Mrs. Lassiter) answered the door.

17. From the moment Mrs. Lassiter opened the door to the point where Officer VanSantford and I entered the home was somewhere around 20-30 seconds.

DECLARATION OF MATTHEW THURING IN SUPPORT OF
RESPONSE BRIEF ON PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT – Page 4– U.S.D.C. Cause No. C05-5320RBL
21 005 cd174801

SCHEER & ZEHNDER LLP
720 OLIVE WAY, SUITE 1605
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

Exhibit 1, P. 4 of 10

18. Mrs. Lassiter did not completely open the door to us, and as such we could not see into the house, could not see all of Mrs. Lassiter to determine if she was in fact alright, and we could not see anyone else who may have been in the home.

19. In my experience, when a person opens the door in a guarded fashion in a domestic violence response it increases the probability that an assault has occurred. The person is afraid to let us in, and this is usually a sign of fear of the abuser, or (if the abuser answers) a sign that something is going on inside they do not want the officers to see.

20. Immediately upon opening the door, Officer Van Santford asked Mrs. Lassiter, "where the male was at." Mrs. Lassiter lied to us, and said there "was no problem and no one else was there." I knew this to be a lie because I heard a male voice yelling not a few minutes earlier. I confronted Mrs. Lassiter with this fact.

21. At this same moment, Officer VanSantford stepped into the doorway of the Lassiter home. Simultaneously, Mrs. Lassiter appeared to look behind her.

22. When Officer VanSantford stepped into the doorway and saw Mrs. Lassiter look behind her, he looked past Mrs. Lassiter and caught sight of a man.

23. It was at this point that Officer Van Santford stepped from the door ledge into the home, and approached the man (Mr. Lassiter). I followed into the house, and I too saw Mr. Lassiter, but stayed with Mrs, Lassiter while Officer Van Santford moved to contact Mr. Lassiter. I observed that Mr Lassiter was not following instructions from Officer Van Santford, and was walking away from Officer Van Santford towards the direction of the kitchen.

24. Officer VanSantford saw Mr. Lassiter walking into the kitchen and ordered him to stop, sit down, or something to that effect. Mr. Lassiter ignored the command and proceeded to walk into the kitchen. I observed Officer Van Santford grab Mr.

DECLARATION OF MATTHEW THURING IN SUPPORT OF
RESPONSE BRIEF ON PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT – Page 5– U.S.D.C. Cause No. C05-5320RBL
21 005 cd174801

SCHEER & ZEHNDER LLP
720 OLIVE WAY, SUITE 1605
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

Exhibit 1, P. 5 of 10

1. Lassiter gently by the arm to stop him from continuing to walk away. I observed
2. Mr. Lassiter turn towards Officer Van Santford and begin to struggle. It was at
3. this point that I moved past Mrs. Lassiter to assist my partner, and it was at this
4. point that we had to use physical restraint on Mr. Lassiter so that we could safely
5. secure the scene and find out if a domestic violence assault had occurred.
6. DATED this 21 day of April, 2006, in BREMERTON, WA.

Matthew Thuring

DECLARATION OF MATTHEW THURING IN SUPPORT
OF RESPONSE BRIEF ON PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT -- Page 6
21 005 cd174801

SCHEER & ZEHNDER LLP
720 OLIVE WAY, SUITE 1605
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

Exhibit 1, P. 6 of 10

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WASHINGTON

I hereby certify that on April 24, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: David Smith, Garvey Schubert Barer, 1911 Second Avenue, 18th Floor, Seattle, WA 98101; and David P. Horton, David P. Horton, Inc., P.S., 3212 N.W. Byron Street, Suite 104, Silverdale, WA 98383-9154, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants: none.

s/ John E. Zehnder, Jr.
John E. Zehnder, Jr., WSBA #29440
Anthony David Gipe, WSBA #30491
Attorneys for Defendants VanSantford and Thuring
SCHEER & ZEHNDER LLP
720 Olive Way, #1605
Seattle, WA 98101
Phone: 206-262-1200
Fax: 206-223-4065
jzehnder@scheerlaw.com
agipe@scheerlaw.com

DECLARATION OF MATTHEW THURING IN SUPPORT OF RESPONSE BRIEF ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – Page 7

21 005 cd174801

SCHEER & ZEHNDER LLP
720 OLIVE WAY, SUITE 1605
SEATTLE, WA 98101
P. (206) 262-1200  F: (206) 223-4065

# BREMERTON POLICE DEPARTMENT

## Domestic Violence Investigation

### DUTIES

1) Secure the scene, identify primary aggressor
2) Get medical treatment for victim if needed.
3) Interview all parties involved.
4) Interview or document all children in the home (they do not sleep through domestic violence situations.) Charging the suspect with criminal mistreatment 2 or reckless endangerment should be considered.
5) Photograph the victim (even if there is not any physical sign of abuse) document her/his appearance at the time of the assault.
6) Photograph the suspect capture her/his demeanor.
7) Photograph all of the children in the home at the time of the assault.
8) Photograph the residence no matter what the condition is.
9) Get a written statement from the victim if possible.
10) Arrange for transportation to a shelter if necessary.
11) Provide victim with a victim's right packet.
12) Get cad report from Cen Com regarding all past calls to the home.

### Document the following on reports

Relationship between victim and suspect
Was alcohol or other drugs a factor?
Was there any property damaged?
Was there any sort of weapon used?
Was the assault physical or was it threats only?
Names and ages of all children in the home.
Victims demeanor and injuries.
Suspect demeanor and injuries.
Will the victim be at a temporary location? Where?

## SUPPLEMENTAL REPORT

Bremerton Police Dept

OCA B03007207

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Investigator: (455) THURING, MATT
Contact: Lasssiter, Alphadoris D

Date / Time: 07/25/2003 13:22:00
Reference: SUPPLMENTAL REPORT

Friday

On 07-25-2003 @ 1318hrs, Officer Van Santford and I were dispatched to 1305 Nipsic in Bremerton for a DV physical in progress. While enroute Cencom advised that the reporting party was a neighbor near the subjects bedroom window who could hear yelling and arguing. Cencom advised a female was crying and telling a male to get off her, and the male was yelling something about getting a knife and cutting her throat.

Upon arrival I could hear a muffled male voice yelling from a room at the North East corner of the house. I listened for a while but could only hear the muffled yelling from the male voice, and the words could not be understood.

I moved toward the front of the house where Officer Van Santford was returning to after listening at the West side of the house. Officer Van Santford and I noted a partially open window at the South West corner of the house and could now hear yelling from inside that room. Officer Van Santford and I began walking up the steps to the front door. As we made noise going up the steps we heard the male voice yell "Get away from the window, stay away from the window, don't talk, stay quiet!". Then all was quiet in the house.

Officer Van Santford knocked on the front door very loudly and received no response. Officer Van Santford knocked very loudly 3 more separate times very loudly and anounced "Police, come to the door". The door was then opened by an Asian female, later identified as "Alphadoris Lassiter".

Officer Van Santford and I stepped into the entry way and Officer Van Santford asked where the male was at. A. Lassiter stated there was no problem and no one else there. I told A. Lassiter that we knew a male was there because we heard them arguing.

Officer Van Santford then saw Kenneth Lassiter walk into the living room from the kitchen area. Officer Van Santford walked past A. Lassiter to contact K. Lassiter. K. Lassiter turned and began walking away from Officer Van Santford. Officer Van Santford told K. Lassiter to stop and tell us what was going on. K. Lassiter continued to walk away without saying a word and appeared to walking straight for the kitchen, a location of many possible weapons. Officer Van Santford again told K. Lassiter to stop, to which K. Lassiter did not respond. Officer Van Santford grabbed K. Lassiter by the left arm, pulling back from the kitchen area into the living room, and told him he could not leave.

K. Lassiter turned and grabbed Officer Van Santford by the his arm and attempted to force Officer Van Santford to release him. I then moved past A. Lassiter who was still in the entry with me. I grabbed K. Lassiter by the right arm and had to use force to make him let go of Officer Van Santford. Officer Van Santford and I both were telling K. Lassiter to stop fighting with us. K. Lassiter began struggling violently, pulling and pushing, to make us let go of him. Officer Van Santford and both told K. Lassiter that he was under arrest. K. Lassiter continued to fight with us.

A. Lassiter saw K. Lassiter fighting with us and came to his rescue, pushing and pulling at Officer Van Santford and I to make us stop arresting K. Lassiter. K. Lassiter yelled at A. Lassiter to get a camera and take pictures of the Police beating him up. A. Lassiter continued to yell at us while looking for a camera, finding a camera, and attempting to photograph K. Lassiter fighting with Officer Van Santford and I.

After 30 seconds to a minute Officer Van Santford and I got K. Lassiter handcuffed and sat him in a chair.

Officer Van Santford and I began asking K. Lassiter and A. Lassiter to identify themselves and explain what was occurring between them that caused the Police to be called. K. Lassiter would not respond to us, but yelled at A. Lassiter to take pictures of us, get our badge numbers, and call the U. S. Attorney. A. Lassiter refused to identify herself and demanded we leave their house.

Officer Van Santford and I decided to remove K. Lassiter from the house to a patrol car so that he was secured and we could talk to them separately.

Immediately upon standing K. Lassiter up to take him to a patrol car he began resisting leaving the house, by

Page 1 of ___

## SUPPLEMENTAL REPORT

Bremerton Police Dept
OCA  B03007207

*THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY*

bracing his legs against the floor and pushing away from the door. A. Lassiter began grabbing Officer Van Santford and I attempting to pull us off K. Lassiter. A. Lassiter also grabbed K. Lassiter and attempted to pull him deeper into the house. As we struggled we all fell onto the couch, then onto the floor. We decided to hold K. Lassiter on the floor and requested Sgt. Olan respond immediately. Officer Van Santford also noticed that K. Lassiter's wrists had received abrasions from his struggling with us, and requested a Bremerton Fire Aid unit to check K. Lassiters injuries.

While waiting for Sgt. Olan and the Aid unit, I explained to A. Lassiter what the Police requirements and responsibilities are under the law to investigate domestic violence calls. While explaining this to A. Lassiter, K. Lassiter kept telling her not to tell the Police anything.

Sgt. Olan arrived and I explained the situation to him. Sgt. Olan then listened to A. Lassiter and again explained the law.

K. Lassiter was checked by Bremerton Fire and found to have no serious injuries. K. Lassiter was removed to a patrol car and threatened law suits while on his way out.

I attempted to contact the original caller to take a witness statement, but received no response. I will attempt to contact her at a later date.

I CERTIFY OR DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_____ 455   07-25-2003
(Signature, Date)
(455) THURING, MATT